**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

SHANE PRATER
o/b/o LAWRENCE PRATER[1],           :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.           :

Case No. 3:07-cv-020

District Judge Walter Herbert Rice
Chief Magistrate Judge Michael R. Merz

**REPORT AND RECOMMENDATIONS**

        Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

        Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a

---

[1]Lawrence Prater died in July, 2006, and Shane Prater brought this action on behalf of Lawrence Prater. However, for ease of reference, the Court will refer to Lawrence Prater as Plaitniff.

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any

other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the

claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD and SSI on October 25, 2000, alleging disability from December 2, 1999, due to numerous impairments.  See Tr. 58-60; 85-94; 16.  Plaintiff's applications were denied initially and on reconsideration.  See Tr. 41-44, 46-49.  A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 48-527), who determined that Plaintiff was not disabled. (Tr. 13-34).  The Appeals Council denied Plaintiff's request for review, (Tr. 3-5), and Judge Padilla's decision became the Commissioner's final decision.

Plaintiff filed an action in this Court seeking judicial review of the Commissioner's decision.  *Prater v. Commissioner of Social Security,* No. 3:04-cv-063 (filed Feb. 19, 2004). Subsequently, the Court remanded the matter to the Commissioner for further administrative proceedings.  *Id.* at Doc. 10, 13, 14; *see also,* Tr. 963-66.  On remand, the Appeals Council vacated Judge Padilla's decision and remanded the matter to him for further proceedings consistent with the Court's Remand Order.  (Tr. 986).  Pursuant to the Appeals Council's order, Judge Padilla held a hearing, (Tr. 1081-1121), and subsequently found that Plaintiff is not disabled.  (Tr. 541-67).  The Appeals Council denied Plaintiff's request for review, (Tr. 525-27), and Judge Padilla's decision became the Commissioner's final decision.  This action followed.

In determining that Plaintiff is not disabled, Judge Padilla found that he met the insured status requirements of the Act through June, 2005. (Tr. 565, finding 1). Judge Padilla also found that Plaintiff has severe polysubstance abuse (including alcohol, cocaine, and marijuana),

4

depression, an anxiety disorder, residual right elbow deformity, and borderline intellectual functioning, but that he does not have an impairment or combination of impairments that meets or equals the Listings. *Id.,* finding 3.  Judge Padilla found further that when he is not abusing substances, Plaintiff has the residual functional capacity to perform a limited range of medium work. (Tr. 566, finding 5).  Judge Padilla then used sections 203.25 through 203.27 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. *Id.,* findings 11, 12.  Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act.  (Tr. 567).

In his Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to his alleged exertional impairments.  (Doc. 9 at 4 n.3).  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged mental impairments.

Plaintiff has a long history of mental illness.  On December 12, 2000, evaluating psychologist Dr. Beach noted that Plaintiff was very depressed and drinking heavily.  (Tr. 167-71). Dr. Beach reported that Plaintiff was open and engaged in conversation, was very restless, had a history of self mutilation, and had previously been diagnosed with bipolar disorder. *Id.*  Dr. Beach reported further that Plaintiff's mood and affect were depressed and sad, he was alert, had previously spent time on a psychiatric unit while in prison and was given Thorazine, and that he described his current alcohol use as "not that much." *Id.*  Dr. Beach noted that Plaintiff described his judgment as "good, except when I am drunk." *Id.*  Dr. Beach noted further that Plaintiff reported problems remembering days and time, and she identified Plaintiff's diagnoses as bipolar disorder NOS, by history and previous diagnosis, post-traumatic stress disorder, and alcohol abuse. *Id.*  Dr. Beach

5

opined that Plaintiff appeared to be a good candidate for social security disability given the combination of his physical and mental disabilities, that he should be evaluated neurologically for the presence of closed head injuries which may account for a number of his symptoms, and that he should participate in group therapy and be prescribed appropriate medication. *Id.*

Plaintiff was evaluated by psychologist Dr. McIntosh on December 28, 2000, who reported that Plaintiff left school after the seventh grade, that Plaintiff reported that he did not drink very much anymore, that he also reported at one time he drank "quite a bit," and that he used narcotics for two or three years around the time his wife died. (Tr. 181-88). Dr. McIntosh reported further that Plaintiff maintained a composed and appropriate affect throughout the evaluation, his overall mood was somewhat fearful and anxious, he appeared to be very tense and uncomfortable during the evaluation, was oriented, and that he had no lapses in alertness or periods of mental confusion. *Id.* Dr. McIntosh also reported that Plaintiff's memory seemed fairly good, his speech was simple but clearly spoken and otherwise normal, he was preoccupied about having been beaten by bikers when he was 17, had limited insight into his source of personal distress and fearfulness, and that he was trying to find work so that he could successfully complete his probation. *Id.* Dr. McIntosh noted that Plaintiff's verbal IQ was 65, his performance IQ was 70, and his full scale IQ was 64, that he was functioning within the extremely low range of intelligence, that testing revealed that his memory function was significantly below average, and that he read at the 1.8 grade level. *Id.* Dr. McIntosh opined that Plaintiff's diagnoses were post-traumatic stress disorder, mild mental retardation with academic, social, and communication skill deficits, and borderline traits, and he assigned Plaintiff a GAF of 51. *Id.* Dr. McIntosh opined further that Plaintiff's ability to understand, remember, and carry out one or two step job instructions appeared to be moderately

6

limited, that instructions must be very simple and slowly given, that his ability to interact with others was impaired, that his capacity to withstand the stress and pressures of day-to-day work activity appeared to be quite limited, and that if he were granted disability benefits he would be able to manage them in his best interest. *Id.*

Plaintiff began receiving mental health treatment at the Good Samaritan Crisis Care Facility in August, 2001. (Tr. 241-54). At the time of his initial evaluation, it was noted that Plaintiff was oriented, had an appropriate energy level, had normal speech, and appropriate mood, and that he was cooperative. *Id.* Plaintiff received counseling from a social worker who noted on October 10, 2001, that Plaintiff had been found living in the woods and not taking care of himself. *Id.*

Plaintiff was hospitalized October 8-11, 2001, after going to the emergency room with suicidal ideation and a plan to cut himself. (Tr. 255-82). At the time of his admission, it was noted that Plaintiff reported he had tried to commit suicide a month ago by cutting himself and on another previous occasion by overdosing on Valium, alcohol, crack, and other unidentified pills that were given to him by somebody in the "woods." *Id.* It was noted further that Plaintiff had been seeing Dr. Jampala at Day-Mont West, that he was taking Trazodone, Depakote, and a sleeping pill, that he had been depressed for the last two weeks, and that he claimed that he had been sober until the other night when he drank a bunch of beer and "whisky with Valium and other pills" which were given to him by somebody in the "woods." *Id.* Plaintiff was treated with medication, eventually reported he was not feeling depressed, and was discharged at which time he was alert and oriented, had an appropriate affect although it was still somewhat constricted, and in an improved condition. *Id.* Plaintiff's discharge diagnosis was major depressive disorder, recurrent, and his GAF on

7

discharge was 45. *Id.*

Plaintiff was hospitalized December 12-17, 2001, after being brought to the hospital by his case worker for worsening depression, anxiety, and thoughts of hurting others, as well as auditory hallucinations. (Tr. 290-326). Plaintiff was admitted to the psychiatric intensive care unit to ensure his safety, to stabilize his mood, and to restart his medications. *Id.* Plaintiff was treated with medications, and was discharged with the diagnoses of major depressive disorder, recurrent and severe, with psychotic features, chronic post-traumatic stress disorder, dysthymic disorder, early onset, and borderline personality disorder. *Id.*

The record contains a copy of Plaintiff's treatment notes from the Day-Mont Behavioral Health Care Facility dated September 25, 2001, through January 23, 2002. (Tr. 327-38). When he initially evaluated Plaintiff, Dr. Jampala reported that Plaintiff was coming into the substance abuse treatment program at Day-Mont as a referral from Crisis Care, that he went to Crisis Care as part of his probation from a domestic violence charge, that his last use of marijuana was about a week ago, that he did not drink anymore because he was taking medications and he was worried about the alcohol and medications mixing, that he had "lost his taste for alcohol," that he was somewhat unkempt, and that he looked a little shabbily dressed. *Id.* Dr. Jampala reported that Plaintiff was alert and very cooperative, showed a degree of motor restlessness, that his mood was initially one of significant anxiety, appropriate and related, that his anxiety seemed to decrease as the interview went on, his affect was broad and stable, and that he seemed to be oriented. *Id.* Dr. Jampala identified Plaintiff's diagnoses as alcohol dependence, marijuana dependence, general anxiety disorder, history of heroin dependence in remission, and rule out atypical bipolar disorder. *Id.* Dr. Jampala identified Plaintiff's GAF as 55. *Id.* The records from Day-Mont revealed that

Plaintiff continued to receive counseling at that facility and that Dr. Pasha followed him for medication evaluation. *Id.*

The record contains a copy of Plaintiff's treatment notes from Good Samaritan Counseling and Treatment Centers/Lifewell Adult Partial Hospitalization Services dated December 20, 2001, through February 12, 2002. (Tr. 339-69). At the time Plaintiff initially received treatment at that facility, his admitting diagnoses were major depressive disorder, severe, recurrent, with psychotic features, chronic post-traumatic stress disorder, dysthmia, and borderline personality disorder, and he was assigned a GAF of 35. *Id.* At the time Plaintiff was discharged from that program, his prognosis was rated as fair and a toxicology screen was negative. *Id.*

Plaintiff was hospitalized April 8-12, 2002, after he went to the emergency room on his own with suicidal ideation, paranoia, and psychosis. (Tr. 390-411). Plaintiff was admitted to the psychiatric unit with suicide precautions, he was treated with medication, and discharged with the diagnoses of major depressive disorder with psychotic features and anxiety disorder, NOS, and his GAF on discharge was 40. *Id.*

Plaintiff continued to participate in group counseling at the Day-Mont Behavioral Health Facility during the period January, 2002, through May 8, 2002. (Tr. 412-32).

Plaintiff was hospitalized July 9-12, 2002, after he was brought to the emergency room by the Dayton Police who reported that Plaintiff had flagged down a police car and told the officer, "I have a problem, can you see it, can you hear it." (Tr. 433-53). At the time of his admission, Plaintiff was oriented only to person, was very unclear about the events leading up to his admission, stated that his last recollection was several days ago when he was staying at his group home, and his drug screen was positive for cocaine and his blood alcohol level was 143 [sic]. *Id.*

Plaintiff was admitted and put on suicide precautions and treated with medications, and he was discharged with the diagnoses of major depressive disorder, recurrent, severe, with psychotic features, post-traumatic stress disorder, cocaine abuse, and marijuana abuse and his GAF was identified as 45. *Id.*

Dr. Pasha reported on October 29, 2002, that Plaintiff's abilities to make occupational and personal-social adjustments were fair and his abilities to make performance adjustments were poor to none. (Tr. 454-56). Dr. Pasha reported further that Plaintiff became anxious and visibly agitated by others, had the potential to react violently if he perceived a threat to himself, was easily distracted by activities going on around him, used poor judgment when dealing with perceived conflicts by becoming confrontational, needed reminders for appointments and other tasks, and demonstrated cognitive, memory, and concentration impairments. *Id.* Dr. Pasha also reported that Plaintiff's actions could be unpredictable and that he demonstrated the inability to retain and recall simple instructions. *Id.*

On August 6, 2003, Dr. Pasha reported that Plaintiff's abilities to make occupational adjustments were fair to poor or none, his ability to make performance adjustments was poor to none, and his ability to make personal-social adjustments was fair to poor or none. (Tr. 696-98). Dr. Pasha also reported that Plaintiff became anxious and agitated by others, had the potential to react violently if he perceived a threat to himself, that he was easily distracted by activities going on around him, and that he used poor judgment when dealing with perceived conflicts by becoming confrontational. *Id.* Dr. Pasha noted further that Plaintiff had a history of past head trauma and demonstrated cognitive, memory, and concentration impairment, that he demonstrated the inability to retain and recall simple instructions, and that his physical conditions of back and joint problems

appeared to cause him pain and limitations. *Id.*

Plaintiff continued to receive counseling services at Day-Mont during the period June 12, 2003, through November 10, 2003. (Tr. 729-86). During that period of time, Dr. Pasha continued to monitor Plaintiff for the purposes of evaluating the effectiveness of Plaintiff's medications. *Id.*

The record contains additional treatment notes from Day-Mont West dated September 3, 2002, through May 19, 2004. (Tr. 788-840). Those notes reflect that Plaintiff saw a counselor as well as Dr. Pasha for treatment. *Id.*

In August, 2005, Plaintiff's mental health care provider at Day-Mont referred Plaintiff to Samaritan Health Center for assessment. (Tr. 841-80). At the time of Plaintiff's initial August 24, 2005, assessment, it was noted that Plaintiff's diagnoses were bipolar disorder NOS, post-traumatic stress disorder, alcohol dependence, and cocaine abuse. *Id.* It was also noted that Plaintiff had a depressed mood, racing thoughts, flashbacks, and anger episodes, all of which were under control with his medications. *Id.* It was recommended that Plaintiff receive substance abuse treatment. *Id.*

In May, 2005, Dr. Patwa treated Plaintiff in Dr. Prada's absence. (Tr. 904-10). Dr. Patwa reported that Plaintiff's diagnoses was bipolar effective disorder, general anxiety disorder, and panic disorder, that he showed poor concentration and an inability to focus on tasks or interactions. *Id.* Dr. Patwa also reported that Plaintiff was moderately to markedly to extremely limited in his abilities with respect to work related mental activities. *Id.*

Plaintiff was hospitalized January 9-13, 2006, after his nephew brought him to the hospital because he a plan to jump in front of a car or shoot himself with his nephew's gun. (Tr.

911-32). At the time he was admitted, it was noted that Plaintiff had been out of his medications for two weeks, had gotten violent the morning of admission and punched holes in the walls at his nephew's home, and that he had a history of depression and polysubstance abuse. *Id.* Plaintiff was admitted and placed on suicide precautions, treated with medications, and discharged with the diagnoses of major depressive disorder with history of psychotic features, post-traumatic stress disorder, nicotine dependence, and a history of polysubstance abuse including cocaine and marijuana. *Id.*

The record contains copies of Plaintiff's additional treatment notes from the Day-Mont Facility dated November 29, 2005, and January 31, 2006. (Tr. 933-37). Plaintiff's diagnoses were identified as bipolar disorder, post-traumatic stress disorder, substance abuse by history, and rule out anxiety. *Id.*

At the administrative hearing, the medical adviser (MA) engaged in a lengthy description of the record. (Tr. 1099-1108). The MA then testified that the record revealed that during the period August, 2005, through January, 2006, there was no evidence of Plaintiff's drug use. (Tr. 1109). The MA also testified that Plaintiff has limitations from his mental health condition, that any work would have to involve simple tasks and no productivity standards or high paced work, that he probably needed repetitive and perhaps close supervision to learn tasks, and that he would be limited from dealing with the public and from teamwork. (Tr. 1109-1110). The MA also testified that Dr. Prada's notes did not reference a history of substance abuse and that it was difficult to know how he evaluated that. (Tr. 1111). The MA testified further that the limitations she described were because of Plaintiff's mild mental retardation which Dr. McIntosh diagnosed as well as his depressive order which was exclusive of the alcohol and drugs, that the record could not

12

establish that Plaintiff satisfied Listing 12.05C because there were no childhood IQ test results, that there was functional illiteracy present, and that Plaintiff had a work history that mitigated against using Listing 12.05 as the factor for not being able to work. (Tr. 111-14).

Plaintiff alleges in his Statement of Errors that the Commissioner erred in determining his residual functional capacity because, without any analysis or comment, he omitted a key component of the limitations the MA identified. (Doc. 9). Plaintiff also alleges that the Commissioner erred by rejecting the opinions of his two treating psychiatrists without determining whether his substance abuse was a factor material to the determination of disability. (Doc. 9).

Indeed, in determining that Plaintiff is not disabled, Judge Padilla relied primarily on the MA's testimony, noting that the reviewing mental health experts' opinions support the MA's conclusions. See Tr. 560. In addition, for various reasons, Judge Padilla rejected Drs. Jampala's, Pasha's, and Patwa's opinions as to Plaintiff's abilities to perform work-related mental activities. Tr. 560-62.

Plaintiff argues in support of his first Error that the Commissioner erred by failing to recognize, or even mention, that based on the MA's testimony that if an individual needs repetitive and close supervision, the VE testified it would be like sheltered work. See Tr. 1119. However, while Plaintiff's counsel described, and the VE considered, in response to Plaintiff's counsel's question, the need for a job which involved "repetitive and close" supervision as being akin to sheltered work, that is not the limitation to which the MA testified. Nor is it the limitation which Judge Padilla found is supported by the evidence.

First, the MA testified that due to his memory problems, Plaintiff probably needed "repetitive and perhaps close supervision *to learn the tasks*". (Tr. 1110)(emphasis supplied). The

13

job limitations which the MA identified were simple tasks, no productivity standards or high paced work, no dealing with the public, no teamwork, and close contact with a supervisor. *Id.* There is nothing in the MA's testimony which indicates that after initially learning the simple tasks, Plaintiff would need "repetitive and close supervision" on a regular basis. Additionally, the MA testified that the record indicated that Plaintiff had the ability to get along with others at least on a superficial level as required in a work setting . (Tr. 1110-11).

In his hypothetical question to the VE, Judge Padilla included, "unskilled, simple, repetitive tasks, assuming functional illiteracy, ... [no] extended periods of concentration and ... low stress jobs, not dealing with the public, no production quotas, no fast paced work, no jobs involving teamwork, and no jobs in contact with drugs or alcohol." (Tr. 1118). In response, the VE testified that an individual with those limitations could perform 25,000 medium, 15,000 light, and 5,000 sedentary jobs. (Tr. 1118-19). The Commissioner properly relied on the VE's testimony in concluding that there is a significant number of jobs in the economy that Plaintiff is capable of performing because the hypothetical question presented to the VE had support in the record and accurately portrayed Plaintiff's impairments which Judge Padilla found credible. *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *see also, Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118 (6th Cir. 1994); *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff argues in support of his second error that the Commissioner erred by rejecting the opinions of his treating psychiatrists.

First, the Court notes that Plaintiff at least implicitly acknowledges that the Commissioner had an adequate basis for rejecting Dr. Jampala's opinion on the basis that "Dr.

14

Jampala had not clearly established a treatment relationship with Plaintiff." (Doc. 9 at 17 n.6).[2] Therefore, the Court will turn to the issue of Drs. Pasha and Patwa's opinions.

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461

---

[2] The Court notes that footnote 6 appears to be incomplete in that the third sentence begins with "Hence" but that there is nothing following that word.

U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

In rejecting Dr. Pasha's and Dr. Patwa's opinions, Judge Padilla specifically determined that their opinions were inconsistent with their clinical notes and were inconsistent with the other evidence of record. This Court concludes that the Commissioner had an adequate basis for rejecting Drs. Pasha's and Patwa's opinions.

With respect to Dr. Patwa's opinion, Judge Padilla rejected that opinion essentially on the same basis that he rejected Dr. Jampala's opinion. Specifically, Judge Padilla determined that Dr. Patwa saw Plaintiff on only two occasions in May, 2005. (Tr. 562). The record supports this finding. Specifically, the record reflects that Dr. Patwa saw Plaintiff on May 4 and May 31, 2005, in Dr. Pasha's absence.[3] (Tr. 909-10). Nevertheless, based on only two examinations, Dr. Patwa opined in August, 2005, that was moderately to markedly to extremely limited in his abilities to perform work-related mental activities. (Tr. 904-05). Under these facts, the Commissioner had an adequate basis for rejecting Dr. Patwa's opinion.

The Court turns to Dr. Pasha's opinion. Although in October, 2002, and August,

---

[3] The Court notes that the records from Dr. Patwa's office indicate that in addition to seeing Dr. Patwa on two occasions, on three occasions, Plaintiff saw counselors in Dr. Patwa's office. (Tr. 906-08). Neither counselor offered an opinion as to Plaintiff's abilities to perform work-related mental activities. Nevertheless, had they offered opinions, the Commissioner would not be required to give controlling, or even great, weight to those opinions because a counselor is not an acceptable medical source. *See* 20 C.F.R. §§ 404.1502, 404.1527(a)(2).

2003, Dr. Pasha opined by way of a check-list report that Plaintiff's abilities to perform most work-related mental activities were poor to none, that opinion is inconsistent with his treatment notes. For example, in January, 2002, Dr. Pasha noted that the degree of Plaintiff's nervousness had decreased considerably, his anxiety had diminished, he was able to talk more logically and relevantly, and that his general progress had been quite satisfactory. (Tr. 327). In July, 2002, Dr. Pasha indicated that Plaintiff was very relaxed, was smiling, was in a pleasant mood, had very infrequent panic attacks, his anxiety level was much lower, and he did not feel depressed. (Tr. 832). In addition, in September, 2002, Dr. Pasha reported that Plaintiff "continue[d] to do very well" and that he had improved considerably. (Tr. 821). Dr. Pasha documented on January 1, 2003, that Plaintiff was doing quite well, and was maintaining non-conflictual adjustment, (Tr. 1028), and on March 27, 2003, Dr. Pasha noted that Plaintiff continued to do quite well, and although he infrequently heard voices, he had a substantial remission in his symptoms. (Tr. 1029).

In addition to not being supported by his own clinical notes, Dr. Pasha's opinion is inconsistent with the MA's testimony as well as with the reviewing mental health experts' opinions. (Tr. 198-215).

Under these facts, the Commissioner had an adequate basis for rejecting Dr. Pash's opinions.

Plaintiff also argues that the Commissioner erred by failing to determine whether substance abuse was a contributing factor material to the determination of disability. This Court is somewhat confused by Plaintiff's argument. For example, if Judge Padilla determined that substance abuse was a contributing factor material to the determination of disability, Plaintiff would not be entitled to benefits under the Act. *See* 42 U.S.C. §§423(d)(2)(C), 1382c(a)(3)(J). In contrast,

17

a determination that substance abuse was not a contributing factor material to the determination of disability would take an individual's application outside the realm of the above-referenced section of the Act.

This Court notes that in the Report and Recommendations of January 21, 2005, upon which the Court's remand was based, it was noted that in March, 2003, when the Commissioner previously rejected Dr. Pasha's opinions, he did so because he assumed they were rendered during a period when Plaintiff continued to engage in substance abuse. *See* Tr. 981-82; *Prater v. Commissioner, supra,* Doc. 10 at 15-16. However, in rejecting Dr. Pasha's opinion in April, 2006, he did so on a different basis; to wit: that it is inconsistent with his treatment notes as well as with other evidence. *See, supra.*

Further, in addition to engaging in a discussion with the MA about Plaintiff's substance abuse, Judge Padilla asked the MA if there was any indication in the record of a time period when Plaintiff was not abusing substances. (Tr. 1104-09). The MA testified that the only period in the record where Plaintiff was not abusing substances was August, 2005, to January, 2006. (Tr. 1109). Finally, Judge Padilla noted that the evidence did not demonstrate that if he were not abusing substances, Plaintiff would still be unable to function independently and that Plaintiff's condition remained relatively stable so long as he maintains sobriety and takes his medications. (Tr. 557; 562).

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a

verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

December 10, 2007.

                                                                           *s/ Michael R. Merz*
                                                     Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).